341 So.2d 1043 (1977)
Jerome J. BORNSTEIN, Individually and As Trustee, Appellant,
v.
Herbert SOMERSON et al., Appellees.
No. 75-813.
District Court of Appeal of Florida, Second District.
January 26, 1977.
Rehearing Denied February 24, 1977.
*1044 Robert G. Petree, Orlando, for appellant.
Michael J. Freedman and Richard A. Hirsch of Levine, Freedman & Hirsch, Tampa, for appellees Herbert Somerson, Irving Weissman and Daniel Keidan.
Eugene W. Harris of Peterson, Carr, Harris & Seacrest, Lakeland, for appellee B.C. Cook & Sons Enterprises, Inc.
Robert E. Puterbaugh of Woolfolk, Myers, Curtis, Craig & Crews, Lake Wales, for appellees Robert E. and Edward H. Parker.
HOBSON, Acting Chief Judge.
In this mortgage foreclosure proceeding plaintiff/appellant, mortgagee, appeals the final judgment holding, inter alia, that the crop of citrus fruit was constructively severed from the mortgaged realty and that the proceeds from the sale of said fruit accrued to the benefit of the defendants, mortgagor and its caretaker, less expenses deducted for maintenance of the property during receivership. In the court below two cases[1] were consolidated and this appeal is taken from the final judgment entered in the consolidated cases following trial. We affirm.
In March of 1973 mortgagors, Somerson, Keiden, and Weissman [hereinafter Somerson], purchased a 330-acre citrus grove from mortgagee, Bornstein, evidencing a portion of the purchase price by a purchase money mortgage and note in the amount of $3,187,500. At the time of sale all that year's crop had been harvested by the mortgagee with the exception of some late bloom fruit which was excluded from that sale by specific reservation in the deed and in the mortgage. The mortgagee did not specifically reserve any lien or security interest on any future crops subsequent to July 1, 1973. The mortgage also provided that "... the property herein described is and shall be the sole security for any and all sums due the mortgagee . . and in the event of default, the mortgagee shall not be entitled to a deficiency judgment against the mortgagor ..." The mortgage contained a standard caretaking clause obligating the mortgagors thereunder and an habendum clause which provided,
"To have and to hold the same, together with the tenements, hereditaments and appurtenances thereto belonging, and the rents, issues and profits thereof, unto the mortgagee, in fee simple."
Somerson thereafter employed appellee, Parker Brothers, to caretake the grove and sell, as an agent, the fruit for the 1973-74 season. The fruit was sold by Parker Brothers for Somerson for that year. Thereafter on June 18, 1974 Parker Brothers, on behalf of Somerson, negotiated and entered into an agreement with appellee B.C. Cook and Sons, Inc., a fruit buyer, to sell the 1974-75 fruit crop. The effect of this agreement is sharply disputed by the parties and forms the basis of the judgment below.
This document, designated "Purchase Agreement and Contract" provided that the seller (Somerson-Parker Brothers) "does hereby bargain, sell and transfer unto the buyer (B.C. Cook) all the fruit that meets the standards for the use agreed upon or specified in this contract at the time of picking the fruit ..." The contract further provided that, "Price of fruit, harvesting and delivery charges and harvesting dates shall be mutually agreed upon between the BUYER and SELLER before the fruit is harvested." The document also contained a provision for a ten cents handling charge per box in the event the seller sold *1045 to another buyer.[2] In the same manner failure on the part of the buyer would result in retention by the seller of any advance made by the buyer as well as the voiding of the contract. No advance was made by Cook toward the sale of the crop at execution of this document.[3]
A supplemental contract was executed between the parties for tangerines (a variety mentioned in the June 18 agreement) on September 16, 1974 and a $5,000 deposit was paid by Cook to Parker Brothers at that time.[4]
On October 10, 1974 mortgagee Bornstein initiated the mortgage foreclosure action and a receiver was appointed by the court. The complaint sought foreclosure on the real property described in the mortgage including the citrus grove and all citrus fruit then growing. None of the 1974-75 crop had been harvested as of this date. The receiver, acting upon court authority, took control of the citrus grove and employed Polo Grove Service, Inc. to perform caretaking during the term of the receivership. The 1974-75 fruit crop was subsequently sold by the receiver for the aggregate sum of $113,868.34, with all the fruit, except the navels, going to Cook pursuant to court direction.[5] The proceeds of this sale were vested in the receiver.
On May 12, 1975 the lower court entered its final judgment specifically finding that the agreement executed on June 18 constituted a contract for the sale of the 1974-75 fruit crop which constructively severed the fruit from the realty so as to remove the proceeds from the sale of the same from the lien of the mortgage. The court directed that the proceeds from the sale and expenses of receivership would be apportioned as follows:
(A) Caretaking expenses ($28,798.45) incurred by the receiver. That portion attributable to the harvested fruit crop and thereby benefitting the mortgagor $11,797.29. The remainder paid to Polo are attributable to the grove (mortgagee) and are to be paid by the same.
(B) Employment of fruit price estimator ($100) charged to the mortgagor.
(C) Receiver's fee ($1,750) primarily of benefit to mortgagee to be paid by Bornstein.
(D) 1974 real estate taxes, paid by the receiver ($8,864.98), charged to mortgagee.
(E) All remaining proceeds of the sale to be paid to mortgagors and Parker Brothers.[6]
The final judgment further provided for the sale of the property encumbered by the mortgage being foreclosed. The sale was held on May 29, 1975, and the mortgagee Bornstein bid in the property for the sum of $330,000.
This appeal presents for determination several issues of vital significance to the citrus industry in Florida. These questions may be summarized as follows:

*1046 (1) Whether an agreement which facially purports to be a contract, but lacks any price, harvesting date and harvesting and delivery charge, and was executed without any deposit being paid, can operate to constructively sever a citrus crop from the mortgage on the underlying citrus grove to the benefit of a mortgagor in a mortgage foreclosure action; and
(2) Whether a mortgage on realty, with a standard reservation of lien on "rents, issues and profits," can defeat the operation of the doctrine of constructive severance so as to vest the proceeds of the sale of a fruit crop, sold during foreclosure proceedings, in the mortgagee as a "profit" of the realty.
For the reasons stated herein, we answer the first question in the affirmative and the second in the negative.
It is axiomatic that in Florida crops of fruit are in general parts of the realty until severed. Simmons v. Williford, 60 Fla. 359, 53 So. 452 (1910); Adams v. Adams, 158 Fla. 173, 28 So.2d 254 (1946); Peer v. Willson, 210 So.2d 495 (Fla.App.2d DCA 1968); 9A Fla.Jur., Crops § 3. However, by acts or intention of the owner, growing fruit may be constructively severed and thus converted into personalty for the purposes of mortgage or sale, even though the fruit remains on the trees. Simmons, supra; Owen v. Commissioner, 192 F.2d 1006 (5th Cir.1951). Cf. Exchange National Bank of Tampa v. Alturas Packing Co., 269 So.2d 733 (Fla.App.2d DCA 1972). Thus a sale or mortgage of the fruit, even though under a general mortgage of the realty, effectively removes the fruit from the realty and out of reach of the mortgagee unless the latter provides otherwise.[7] The parties agree that the sale of the tangerines, pursuant to the supplemental contract, fell within this latter category as a constructive severance. Additionally, no dispute exists as to whether Bornstein explicitly reserved any rights to future fruit crops on the mortgaged land. He did not.
Although Bornstein asserts that the agreement executed on June 18, 1974 was nothing more than an agreement to agree,[8] we think the import and significance of this document requires that it be construed as a binding contract. It is clear that the fruit, at the time of the sale, were goods as contemplated by § 672.2-107(2), Florida Statutes (1975). It is equally recognized that a contract for the sale of goods will not fail for indefiniteness even though one or more terms are left open. Section 672.2-204(3), Florida Statutes (1975). However, the latter rule is tempered by the proviso that: 1) the parties must have intended to make a contract and 2) there exists a reasonably certain basis for giving an appropriate remedy. Section 672.2-204(3), supra. As stated in Uniform Commercial Code § 2-204, Comment 3,
"The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. Rather commercial standards on the point of `indefiniteness' are *1047 intended to be applied, this Act making provision elsewhere for missing terms needed for performance, open price, remedies and the like."
Florida courts, both prior to and after the adoption of the Uniform Commercial Code, have recognized these principles with respect to "open terms." See, e.g. Roe v. Winter Haven Co., 104 Fla. 317, 140 So. 463 (1932); Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Financial Corp., 302 So.2d 404 (Fla. 1974). In Roe, supra, involving an agreement for the sale of fruit, it was held that mere inability to ascertain the quantity and price of the fruit at the time of contracting did not prevent the contract from operating as contract in praesenti. The contract was held as passing title at the time of its execution. Similarly, our Supreme Court, in addressing the point of indefiniteness in Blackhawk Heating & Plumbing, supra, stated,
"The contract should not be held void for uncertainty unless there is no other way out. As was stated by Justice Cardozo in Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., Inc., 232 N.Y. 112, 133 N.E. 370, 371, `Indefiniteness must reach the point where construction becomes futile.'"
This view conforms with the official comments to Section 672.2-204(3).[9]
Even without the benefit of Section 672-2.204, supra, other sections of the Florida Uniform Commercial Code would remedy the alleged deficiencies in this contract. See, Section 672.2-305, Florida Statutes (1975) (open price term) and Section 672.2-309, Florida Statutes (1975) (absence of specific time provisions). These sections contained in Article III of our Commercial Code read in pari materia with the liberal interpretation given Section 672.2-204, supra, enable us to answer sufficiently any contention that the contract sub judice fails to specify price, harvesting dates and harvesting and delivery costs. In fact, as a complement to 672.2-204, supra, the official comment to 672.2-305, supra, provides in part,
"This section (672.2-305) applies when the price term is left open on the making of an agreement which is nevertheless intended by the parties to be a binding agreement. This Article rejects in these instances the formula that `an agreement to agree is unenforceable' ... and rejects also defeating such agreements on the ground of `indefiniteness'. Instead this Article recognizes the dominant intention of the parties to have the deal continue to be binding on both." (emphasis added) Uniform Commercial Code § 2-305, Comment 1.
In construction of a written contract it is the duty of the court to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties, to determine the meaning and intent of the language employed. St. Lucie County Bank & Trust Co. v. Aylin, 94 Fla. 528, 114 So. 438 (1927); Blackhawk Heating & Plumbing Co., Inc., supra. On appeal, unless clearly erroneous, the construction placed upon a contract by the trial judge should be affirmed. Clark v. Clark, 79 So.2d 426 (Fla. 1955); Rylander v. Sears, Roebuck & Company, 302 So.2d 478 (Fla.App.3d DCA 1974). After close examination of the subject agreement, we conclude that the trial judge's construction of this citrus "Purchase Agreement and Contract" was correct. While parts of the contract were more nearly akin to a "handling" type of agreement whereby Cook would act as the owner's agent for the sale of fruit, the court was privileged to accept the expert testimony which characterized this type of contract in the citrus industry as a sales contract. It is obvious from the record that both Parker Brothers and B.C. Cook & Sons intended to be bound and that the price of the fruit, the picking and hauling *1048 charges, and the picking dates were to be set according to prevailing industry standards on those dates.
We are cognizant of the mortgagee Bornstein's admonition that to uphold this citrus sales agreement as a contract, which constructively severs the fruit crop from the mortgaged realty, will jeopardize the position of all mortgages on land with citrus crops growing thereon. However, we would note that substantial evidence was adduced during these proceedings to suggest that this type of sales agreement, with one or more terms left open, is common in the citrus industry and that greater harm would be done by holding this contract void for indefiniteness. This conclusion is required in this instance[10] in light of the modern rules of construction, statutory directives, and case law applying these principles. Cf. Exchange National Bank of Tampa, supra. Moreover, despite the mortgagee's assertions, an adequate remedy was available to Somerson and Parker Brothers upon default by Cook.[11]
Mortgagee Bornstein's next contention is that despite the constructive severance, the proceeds of the sale of the citrus crop by the receiver were "rents, issues and profits" which should have been applied to satisfy the mortgage indebtedness rather than paid to the mortgagor and their caretakers, Parker Brothers. Although Bornstein correctly asserts that the significance and effect of the encumbrance or pledge of the issues and profits is not linked to the operation of the doctrine of constructive severance, he misinterprets the effect of the latter doctrine as it applies in the case sub judice. The general rule with respect to a mortgage pledging rents, issues and profits is that the mortgagee becomes entitled to receive such rents, issues and profits to be credited against his mortgage debt from the time he takes possession of the property either by consent of the owner or *1049 through the appointment of a receiver in foreclosure proceedings. See White v. Anthony Inv. Co., 119 Fla. 108, 160 So. 881 (1935) and authorities cited therein. In White the Supreme Court also posited,
"... The rule appears to be that he is not only entitled to the rents which accrue after that time, but he is entitled to such rents as have accrued prior to the appointment of a receiver and after default but which have not been paid." (emphasis supplied) 160 So. at 882.
The key consideration here is that at the time of default, some three and one-half months after execution of the fruit contract, the fruit crop, having been constructively severed, was no longer part of the mortgaged res. Therefore, the proceeds of that crop, having been sold during the term of the receivership, were personalty of the mortgagor and not a rent, issue, or profit of the mortgaged realty subject to application for reduction of the mortgage indebtedness. Cf. Bay Realty Corporation v. Becker, 157 So.2d 91 (Fla.App.3d DCA 1963). See also, 22 Fla.Jur. Mortgages § 451. Were there no constructive severance of the fruit crop by the contract of June 18, 1974, then the mortgagee would be correct in asserting that these proceeds should have been applied to reduce the mortgage indebtedness. However, the default and appointment of a receiver occurred after the severance of the crop from the mortgaged realty and the proceeds herein were properly returned to the mortgagor less monies owed to the caretaker and expenses of the receivership.
Other propositions argued have been carefully considered, but no special comment is found to be necessary with reference to same. Accordingly, the judgment is
AFFIRMED.
GRIMES and SCHEB, JJ., concur.
NOTES
[1] Parker Brothers instituted a separate suit for caretaking services following the filing of Bornstein's mortgage foreclosure action. This suit, with both mortgagee and mortgagor named as defendants, was consolidated with the mortgage foreclosure action.
[2] This provision reads,

"If any portion of fruit covered by this contract should be sold to another party by the SELLER, a pro-rata share of any money advanced plus 10¢ per box service charge for checking fruit, advising the grower of quality of fruit, market conditions, etc. shall be returned to the BUYER before any fruit shall be released from this contract."
[3] Testimony in the record reveals that Parker Brothers, at the execution of this document, was offered a $20,000 to $25,000 deposit, but turned it down because they were afraid of spending it prior to the time the crop was actually harvested.
[4] The effect of this contract is not disputed. Both parties stipulated to the constructive severance of the tangerines from the realty.
[5] This sum excludes the $5,000 received by Parker for the supplemental contract on the tangerines.
[6] The court ordered Bornstein to pay to the receiver $27,616.18 which included the receiver's fee, ad valorem taxes for the year and the share of caretaking costs incurred by the receiver in appointing Polo Grove Service. The court also ordered the $101,971.09, representing the proceeds of $113,868.34 less the grove caretaking costs (Polo), paid to Somerson and Parker Brothers pursuant to stipulation.
[7] The mortgagee could have reserved a security interest in the citrus crops to be harvested subsequent to July 1, 1973. §§ 679.9-203, 679.9-204 Fla. Stat. (1975) provide a mechanism whereby Bornstein could have obtained a lien on the future crops as collateral for outstanding indebtedness. Properly identified, this security interest could have remained effective even after sale of crops and during foreclosure proceedings. § 679.9-203, supra.
[8] Bornstein contends that several deficiencies negate the existence of a contract. Among those defects are the following:

a. No deposit paid at the execution despite reference to advances in the agreement;
b. Lack of mutuality in that Parker Brothers could have sold to another buyer without penalty;
c. The 10 cent service charge contemplates the possible sale to another buyer;
d. Testimony of at least one individual with experience in the citrus industry who stated that this type of sales arrangement was nothing more than a handling contract rather than a sales contract; and
e. The instrument fails to specify price, harvesting dates, harvesting and delivery costs.
[9] Uniform Commercial Code § 2-204, Comment 1 provides,

"The more terms the parties leave open the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions."
[10] We go no further than the specific facts before us. Despite its common use, this "Purchase Agreement and Contract" could, in another factual context, be held void for indefiniteness. Thus the more terms left open the greater the likelihood of no contract being intended. Uniform Commercial Code § 2-204, Comment 1. We would suggest that the nature of the citrus industry requires many factors to be left open in sales contracts for future crops. For more extensive treatment of the construction of contracts for the sale of crops, see generally Annot., 87 A.L.R.2d 732 (1963); 21 Am.Jur.2d Crops §§ 1-88 (1965).
[11] Bornstein asserts that since no cash deposit or advance was made by Cook at the time of contracting that the contract's recitation

"Should BUYER fail to comply with the terms and conditions herein enumerated, this contract shall become null and void and the advance made to SELLER shall be retained by said SELLER in full payment of liquidated damages."
is without force and effect, thereby leaving Somerson and Parker Brothers without a remedy.
This provision clearly was intended to be the sole remedy of the seller in the event of default by Cook. However, when Parker Brothers refused to accept any deposit or advance at the time of contracting, Note 3, supra, the remedies available under the code, §§ 672.X-XXX-XXX.2-706, Florida Statutes (1975) were invoked. This conclusion conforms to the view found in § 672.2-719(2), Fla. Stat. (1976) which states,
"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code."
The official comment to this subsection states in part,
"Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain it must give way to the general remedy provisions of this Article." Uniform Commercial Code § 2-719 Comment 1.
Here the remedy available to Parker Brothers was inadvertently waived in its refusal of the advance or deposit offered by Cook. Since preservation of the contract, evidenced by intent of the parties to be bound, is the key factor, we hold that the contract here did afford Parker Brothers all the remedies available under the code sections enumerated above. Cf. Miller Yacht Sales, Inc. v. Scott, 311 So.2d 762 (Fla.App.4th DCA 1975). However, this result does not authorize unilateral rejection of liquidated damages provisions in contracts so that a party may invoke more liberal code remedies. Nor does it seem likely that a party to a contract having voluntarily waived or rejected an exclusive remedy could recover, upon breach, an amount in excess of the damages contemplated in the original agreement.