468 A.2d 748

**BETHLEHEM STEEL CORPORATION, Appellant,**

**v.**

**LITTON INDUSTRIES, INC., a Corporation, and Erie Marine, Inc., a Division of Litton Industries, Trading as Erie Marine Division of Litton Industries.**

Superior Court of Pennsylvania.

Argued July 12, 1983.

Filed Nov. 4, 1983.

Petition for Allowance of Appeal Granted April 30, 1984.

---

William B. Mallin, Willis A. Siegfried, Jr. and Robert L. Byer, Pittsburgh, and Curtis H. Barnette and David M. Beckwith, Bethlehem, for appellant.

Bruce W. Kauffman, Carl H. Hanzelik, Jonathan O. Natelson, and Paul S. Diamond, Dillworth, Paxson, Kalish and Kauffman, Philadelphia, for appellees.

Before CERCONE, President Judge, and HESTER, CAVANAUGH, WICKERSHAM, ROWLEY WIEAND and HOFFMAN, JJ.

WICKERSHAM, Judge:

The central issue in this case is whether a certain written option agreement is a contract. The matter was contested in a bifurcated non-jury trial and, by consent of both parties, liability alone was at issue. The trial judge, Honorable Maurice Louik entered an adjudication in which he held that the plaintiff-appellant had not sustained its burden of proving that the parties intended to be contractually bound. Exceptions to the trial court's adjudication were argued before a court *en banc* comprised of the Honorable Judge Louik, Judge Nicholas P. Papadakos and the Honorable Joseph A. Del Sole which court *en banc* dismissed the exceptions of plaintiff-appellant and affirmed the adjudication of Judge Louik. This appeal followed. We agree with the conclusion reached by Judge Louik and the court *en banc* and we affirm.[1]

On June 19, 1974 Bethlehem Steel Corporation, plaintiff-appellant filed a complaint in assumpsit against Litton

---

1. Judge Del Sole "concurred in the result." This appeal was originally argued December 4, 1980 before a panel of this court. By order dated March 14, 1983 appellee's application for reargument before an *en banc* panel was granted which argument was held July 12, 1983.

Industries Inc. and Erie Marine, Inc., a division of Litton Industries, trading as Erie Marine division of Litton Industries, hereinafter Litton, appellee.

Basically the complaint alleged that on or about April 25, 1968 Litton entered into an agreement with Bethlehem whereby Litton would construct and deliver and Bethlehem would purchase a one thousand foot self-unloading ore vessel. The vessel constructed under that agreement was delivered, accepted, and the price paid therefor.

The complaint further alleged that Litton extended to Bethlehem by letter dated April 25, 1968 "a written offer good until December 31, 1968 for the entry into an option agreement for five vessels." Furthermore, it was alleged that on or about December 31, 1968 Bethlehem accepted the Litton's offer to enter into an option agreement under which Bethlehem was granted the right for a period of five years after the execution of the option agreement to obtain from Litton from one to five vessels for prices varying between $22,400,000.00 and $18,400,000.00 each. Further, the complaint alleged that Bethlehem, pursuant to the option agreement, by letter dated November 16, 1973 exercised its option for two vessels and thereby ordered the first and second vessels in accordance with the option agreement. On December 26, 1973 Bethlehem, pursuant to the option agreement, exercised its option for an additional (third) vessel.

Finally, the complaint alleged that Litton expressly and unequivocally refused to perform in accordance with its obligations under the option agreement; that Litton demanded the payment of a price for each vessel many millions of dollars in excess of the price provided for in the option agreement and indicated delivery dates substantially later than the delivery provided in the option agreement. Damages were sought in a sum in excess of $95,000,000.00 together with interest and costs. On March 8, 1976, the case was designated as complex and was assigned to the Honorable Maurice Louik for all further proceedings.

In its defense, Litton responded, *inter alia:* (1) PX–1 (the letter of December 31, 1968) was never intended to be and was not a contract; (2) no contract was formed in any event because the vital terms left for later negotiation could not be filled by the court on a reasonably certain basis; (3) any purported "option agreement" had been rejected prior to exercise by Bethlehem's assertions that it would "never" order another vessel from Litton; (4) since an "option" unsupported by consideration is revocable at will, any purported "option agreement" had been revoked prior to exercise by Litton's notice to Bethlehem that the Erie shipyard. was to be closed; (5) any purported "option" had never been properly exercised; and (6) Litton had never breached or repudiated any "agreement" which might have existed.

On June 28, 1978 a non-jury trial began and Judge Louik filed his adjudication on June 6, 1979 which provided, in part, as follows:

### "ADJUDICATION

"LOUIK, J.

"After a protracted trial of approximately nine months with over 12,000 pages of testimony and some 500 exhibits, this matter is now before the Court for determination. The claim in excess of 95 million dollars, together with a counterclaim, is based on a two-page letter between two giant corporations. The Court has bifurcated the trial as to liability and damages. The issue before the Court presently is that of liability. Although the matter proceeded during such a lengthy period of time, the facts may be succinctly stated as follows.

"For background purposes, it should be noted that on April 25, 1968, at a formal signing ceremony, the plaintiff and defendant entered into a ship-construction contract for a newly designed 1,000 foot self unloading ore vessel. This vessel, known as Hull 101, was commissioned "The Cort". In the contract for the Cort, the plaintiff was given the right of first refusal in connection with any possible future construction of such vessels. In addition, a two-ship option

agreement was executed on the same day. Although these items are not an issue in this case, the relevancy and effect of the provisions of the right of first refusal and the two-ship option agreement in the instant claim will be the subject of discussion later.

"In addition, there is in evidence as PX–4 a document which was executed on that very same day, April 25, 1968, together with a document dated December 31, 1968, in evidence as PX–1. These are the documents in issue in the instant case.

"The primary and fundamental question now before the Court is whether or not there has been an option contract. The plaintiff's claim is based upon the following two-page letter:

ERIE MARINE, INC.

ERIE, PENNSYLVANIA

April 25, 1968

Bethlehem Steel Corporation
Bethlehem, Pennsylvania
Attn: Ralph K. Smith

Gentlemen:

Reference is made to the ship construction contract signed by our companies this date for the construction by us of a 1,000' self-unloading ore vessel for you. Reference is also made to my letter to you of this date extending to you an option to purchase either one or two additional vessels upon the terms therein set forth.

We hereby extend to you an offer to enter into an option agreement to have us construct for you from one to five additional vessels in accordance with "Specifications covering the Construction of a Self-Unloading Bulk Carrier for Bethlehem Steel Corporation" (Number Y 917) dated March 1968, addendum number 1 thereto dated March 28, 1968 and addendum number 2 thereto dated April 17, 1968. This

offer to enter into an option agreement shall be firm and irrevocable until December 31, 1968 at 5:00 P.M. E.S.T.

The terms of the option agreement are to be as follows:

(a) The specifications for the vessels shall be the specifications referred to above, except for mutually agreeable reduced test schedules of the vessels, if the testing of the vessel to be delivered under the contract executed this date proves successful.

(b) Bethlehem to have the right at any time within five years after the effective date of the option agreement to order from one to not more than a total of five vessels, for delivery within 24 months from the date of the order for the first vessel ordered and for delivery within 24 months plus 4 months for each additional vessel ordered within any one calendar year; provided however no vessel shall be scheduled for delivery between November 31 and March 31.

(c) The price of the vessel shall be as follows:

1st vessel ordered $22,400,000.00
2nd " " $21,400,000.00
3rd " " $20,400,000.00
4th " " $19,400,000.00
5th " " $18,400,000.00

(d) The vessel prices are subject to escalation for both labor and material for a base price of $20,400,000.00 for each vessel and based upon Fourth Quarter 1968 mutually agreed upon index such as:

Material— Material index for Bureau of Ships steel vessel contracts" furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

Labor— 'Index of changes in straight-time average hourly earnings for selected shipyards' (June 1962 = 100) for steel ship construction, furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

At the time of exercise of the option for any vessel, the escalation shall be computed to the date of contract execution, and an appropriate contract clause will be included therein providing for quarterly escalation thereafter. We will furnish you the labor and material percentages subject to escalation by May 15, 1968.

(e) The terms and conditions of the ship construction contracts to be in accordance with the attached terms and conditions and any other mutually agreed to terms and conditions and shall contain a clause giving to Bethlehem the right to cancel at any time upon the payment of all of our costs incurred to date of cancellation, including similar vendor and subcontractor cancellation charges, plus 15% of such costs.

Very truly yours,<br>George K. Geiger

"In response to this letter, a letter dated December 31, 1968 was sent by Bethlehem to Erie which stated in part 'We hereby accept your offer of an option to have you construct for us from one to five additional vessels...' In all other respects, the letter of December 31, 1968 is merely identical repetition of the language in the letter of April 25, 1968. This letter of December 31, 1968 appears in the record as PX–1.

"On November 16, 1973, plaintiff sent a letter to defendant stating that it exercises its option to order two vessels and then on December 26, 1973, plaintiff sent another letter to defendant stating that it exercises its option to order a third vessel. These letters appear in the record as PX–7 and PX–9, respectively.

"Defendant did not enter into any ship construction contract with plaintiff and did not construct any vessels under the letters of November 16, 1973 and December 26, 1973.

"*The issue then is whether these letters, considered with the surrounding circumstances, constitute a contract. The plaintiff's position is that they do constitute a contract, both under general common law and under the*

*Uniform Commercial Code. The defendants' basic position is that under neither the general common law nor the Uniform Commercial Code do these letters constitute a contract, but at most, are merely an agreement to agree.*

\* \* \* \* \* \*

### "CONCLUSION OF LAW

"1. Bethlehem has not sustained its burden of proof, either in law or in fact, of imposing liability on Litton-Erie, and a finding accordingly will be entered in favor of Litton-Erie on Bethlehem's claim.

"2. Litton-Erie has not sustained its burden of proof imposing liability on Bethlehem in its counterclaim, and a finding accordingly will be entered in favor of Bethlehem on the counterclaim of Litton-Erie."

\* \* \* \* \* \*

Appendix B, Appellant's Brief on reargument at B–1 and B–42. (emphasis added)

### SCOPE OF REVIEW

██ It is quite clear that the scope of appellate review of a finding on contractual intent is limited—indeed narrowly circumscribed.

The "intent to contract" is a question of fact for the trier-of-fact. A recent example is *Field v. Golden Triangle Broadcasting Company, Inc.*, 451 Pa. 410, 305 A.2d 689 (1973), *cert. den.*, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974), where the Pennsylvania Supreme Court held:

> Initially, we note that when the evidence is conflicting as to whether the parties intended that a particular writing would constitute a complete expression of their agreement it has been held that it is a question of fact for the trier of fact to determine whether a contract exists.

451 Pa. at 414, 305 A.2d at 691. In *Yellow Run Coal Co. v. Alma-Elly-Yv Mines*, 285 Pa.Super. 84, 426 A.2d 1152 (1981), this Court, Spaeth, J., held (citing *Field, supra*):

> When the evidence is in conflict as to whether the parties intended that a particular writing should constitute an

enforcible contract, it is a question of fact whether a contract exists.

285 Pa.Super. at 87, 426 A.2d at 1154.

In *Hatalowich v. Redevelopment Authority of Monessen*, 454 Pa. 481, 312 A.2d 22 (1973), our Supreme Court held:

> Liminally, it must be emphasized that the scope of our review here is narrowly circumscribed. It is well settled that the chancellor's findings of fact approved by the court *en banc* have the effect of a jury verdict and will not be disturbed on appeal if supported by competent evidence. While we are always free, and indeed are duty bound, to modify erroneous applications of law, when, as in the instant case, determination of the parties' intent is crucial, the chancellor's factual conclusions, if supported by competent evidence, will not be overturned.

454 Pa. at 484, 312 A.2d at 23. In *Goldman v. McShain*, 432 Pa. 61, 247 A.2d 455 (1968) where the supreme court reversed a summary judgment and remanded for trial on the issue of contractual intent, Mr. Justice (now Chief Justice) Roberts held:

> We have no doubt that had the chancellor permitted the parties to go to trial and had then, upon hearing all testimony, concluded as a finding of fact that Goldman and McShain did not intend the March agreement to be an enforceable contract, this Court would not have disturbed such a finding assuming there was competent evidence below and the court did not abuse its discretion.

432 Pa. at 68, 247 A.2d at 458. Similarly, in *Yellow Run Coal, supra,* this Court explicitly held:

> When the trier of fact has determined the intention of the parties to an agreement, an appellate court will defer to the findings, so long as they are supported by the evidence.

285 Pa.Super. at 90, 426 A.2d at 1155.

■ Like our scope of review of the factual finding of contractual intent, the standards pursuant to which an

appellate court considers a trial record to determine whether factual findings are supported by competent evidence are indisputably well-settled. It is axiomatic that a trial judge's findings of fact, sustained by the Court *en banc*, have the weight of a jury verdict and cannot be disturbed on appeal if supported by competent evidence in the record. As this Court held in *Brenna v. Nationwide Insurance Co.*, 294 Pa.Super. 564, 440 A.2d 609 (1982);

> In our review on this case, we must be mindful that findings of a trial judge in a non-jury case must be accorded the same weight and effect on appeal as the verdict of a jury, and will not be reversed in the absence of an abuse of discretion or a finding of a lack of evidentiary support. The appellate court, in these circumstances, is limited to determinations of whether the trial court's findings are supported by competent evidence and whether the trial court committed an error of law. It is also clear that in reviewing the findings of the trial judge, the victorious party is entitled to have the evidence viewed in the light most favorable to him and all the evidence and proper inferences favorable to the successful party must be taken as true and all unfavorable inferences rejected.

294 Pa.Super. at 567, 440 A.2d at 611. This Court similarly held in *Walsh v. Pennsylvania Gas & Water Co.*, 303 Pa.Super. 52, 449 A.2d 573 (1982), in examining the Record upon review of the findings of a trier-of-fact:

> .... the evidence together with all reasonable inferences therefrom must be viewed in a light most favorable to the verdict winner and all conflicts in the evidence are resolved in favor of the prevailing party. Evidence supporting the verdict is considered and the rest rejected.

303 Pa.Super. at 58, 449 A.2d at 576.

We have reviewed the entire trial record and viewing the evidence in the light most favorable to the victorious party below, a fair distillation of the evidence would indicate the following scenario.

This controversy arose out of ship construction on the Great Lakes. Litton, a newcomer to the Lakes, tried unsuccessfully through its subsidiary, Erie, to develop a market for a unique and revolutionary supertanker-type ore vessel, 1,000 feet long with novel self-unloading features. In seven years of effort (from 1967 to 1973), however, Litton sold only one ore vessel ("Hull 101")—to Bethlehem.

In 1968, Litton and Bethlehem exchanged two incomplete letters, one dated April 25, 1968 (PX–4) and the other dated December 31, 1968 (PX–1), concerning an offer to negotiate a long-term option agreement for construction of up to five novel multi-million dollar vessels at Litton's new shipyard. In the words of Judge Louik: "If anything, there is one matter that is absolutely clear, and that is that the writing provides that further agreements between the parties are necessary." (Ad 13). During the ensuing years, Litton repeatedly attempted to interest Bethlehem in commencing the negotiations contemplated. These efforts were in vain, however, and from late 1972 through early 1973 Litton repeatedly informed Bethlehem of its intention to close the Erie shipyard unless ship construction orders were immediately forthcoming. When Bethlehem disclaimed interest in purchasing any additional ships and no other contracts were obtained, Litton began closing its Erie yard and disbanding its workforce.

Thereafter, however, Bethlehem notified Litton that it wished to negotiate a ship construction contract pursuant to PX–1. When the parties were unable to agree on contractual terms, Bethlehem commenced this action, contending that despite the parties' failure to agree upon the myriad terms explicitly left for future negotiations, the mere exchange of the letters in 1968 bound the parties to a "contract" for the construction of novel ships worth millions of dollars.

The April 25, 1968 Letter (PX–4)

After four months of careful negotiation and drafting and redrafting of contract terms, representatives of Litton and Bethlehem met on April 25, 1968 for the ceremonial exchange of a contract for the immediate construction of Hull

101, the only one thousand foot vessel actually sold by Litton, for the firm fixed price of $17,994,138.00 ("Hull 101 Contract"). Bethlehem's Board of Directors had insisted upon "great precision" in every aspect of the sale, especially price. The Hull 101 Contract was fully performed and is not at issue here.

During the two to three hours that the parties were together on April 25, 1968, primarily for the exchange of the Hull 101 contract, they jointly drafted a two-page letter (PX–4), extending a last minute sales promotional offer to negotiate a long-term option agreement for up to five additional Hull 101 type vessels. The parties clearly understood that PX–4 was not part of the consideration for the Hull 101 Contract. With one exception, none of the representatives at the April 25 meeting even was aware before that meeting that such an offer was to be made or drafted that day. On its face, PX–4 clearly was not an option agreement; rather, it expressly provided for future negotiations which, if successfully completed, would have resulted in an option agreement which, in turn, if properly exercised, would have resulted in formal execution of a formal written ship construction contract.

In hurriedly drafting PX–4 during a part of their short meeting on April 25, the parties explicitly agreed that price escalation would be included in any long-term option agreement and ship construction contract upon which they might subsequently agree. The parties further expressly acknowledged, however, that because escalation was so critical and so complex, they would postpone the negotiations necessary for agreement upon that vital subject.

PX–4 thus was jointly drafted during the less than three-hour meeting on April 25 in the form of a two-step offer to enter into a future option agreement in order to provide until the end of the year for the parties to investigate and develop the terms of an appropriate escalation clause and the other important matter intentionally left for future negotiation and agreement.

Having taken more than four months to negotiate a contract for a single vessel (Hull 101), on which construction was to begin immediately for a fixed price with no escalation, the parties recognized that negotiation of a long-term option agreement for up to five novel multi-million dollar vessels providing for price escalation would be infinitely more complex and time consuming.

On several occasions from May through November of 1968, Litton sought to negotiate the terms of an option agreement. On each occasion, Bethlehem replied that it was not yet willing to spend the time and effort required for such negotiations, since it would not even consider additional 1000 foot ore vessels until the revolutionary Hull 101 had been successfully operated for at least one season.

By December of 1968, aware that the PX-4 offer was about to lapse, but still unwilling to devote the time necessary to negotiate the terms essential for a definitive option agreement and ship construction contract, Bethlehem sought to preserve the status quo.

Between April 25 and December 31, 1968, there were no discussions, negotiations or agreements between the parties with respect to any of the terms, including escalation, expressly left for future negotiation and mutual agreement under PX-4.

In short, whatever the parties had intended by drafting PX-4 was unchanged by PX-1. In PX-4 the parties had explicitly contemplated negotiations and agreements necessary to create a binding option contract. PX-1 did not resolve any of the substantive terms left open for negotiation in PX-4; as the record clearly reveals, it was adopted as an accommodation to Bethlehem's request for a "holding pattern."

From 1968 through 1973, Litton attracted no other customers to its Erie shipyard. Indeed, by early 1973, Litton officials warned Bethlehem that the Erie yard would be closed unless Bethlehem ordered additional ships. Bethlehem officials had previously stated, however, that they were "disgusted" by the "slow" construction of Hull 101,

and by 1973, rather than express any objection to the closing of the Erie yard, repeatedly insisted that they would never order any additional ships from Litton. Thus, without any hope of future business from Bethlehem, Litton "mothballed" its Erie yard.

Thereafter, in full knowledge of the fact that the Erie Shipyard had dismissed most of its labor force for lack of business, Bethlehem notified Litton by letter that it was planning to "exercise its options" for ore vessels. Significantly, however, Bethlehem expressly acknowledged that the terms of an option agreement had to be negotiated before Bethlehem could exercise any option.

At subsequent meetings, Litton advised Bethlehem that although it had closed down its shipyard in reliance upon Bethlehem's representations, it was willing to build vessels if the parties could reach agreement on a ship construction contract (Ad–9), which Litton was at all times willing to negotiate. The parties, however, never agreed on any of the material terms left open in PX–4 and PX–1, including escalation—found by the trial judge to be "one of the most critical provisions of a ship construction contract" (Ad–26). Nor would Bethlehem accept any of Litton's alternative proposals.

Judge Louik carefully considered all the relevant factors under the common law and under the Uniform Commercial Code—the letters themselves, the discussions at the time of the exchange of the letters, the surrounding circumstances, subsequent conduct, the nature of the contemplated construction contract, and the parties' prior dealings—and found that the parties did not intend to enter a binding agreement until they mutually agreed on the critical terms intentionally deferred, including the terms of a price escalation clause, and reduced those terms to a formal ship construction contract. The Court alternatively found that under Section 2–204(3) of the UCC, no contract had been formed—because the Court simply could not, on "a reasonably certain basis," fill in the price escalation terms and other missing contract provisions in order to provide for "an appropriate remedy."

## NATURE OF ESCALATION

It is literally impossible to understand PX–4 and PX–1 without a knowledge of escalation and the nature of an escalation clause, "one of the most critical provisions of a ship construction contract" (Ad–26). Expert testimony on this complex subject consumed 23 trial days and nearly 3,000 pages of transcript. The trial judge, having become fully familiar with the intricacies and complexities of this highly technical discipline, recognized the critical importance of escalation in long-term multi-million dollar ship construction during a period of double digit inflation and found that a court cannot fashion an escalation clause for parties who are unable to do so for themselves. (See Findings of Fact 18–22, Ad–6–7; Ad–13–14, Ad–20, Ad–25–31.) The difference in the amount of escalation by varying just some of the elements of hypothetical escalation clauses which Bethlehem created for purposes of trial was shown to amount to millions of dollars per vessel. (Ad–26, 27). In the words of the trial judge: "All of the expert testimony indicated that an escalation clause could not be materialized from the air by the Court. Because of the nature of negotiations in shipbuilding and the extreme complexity of the undertaking, an escalation clause requires careful negotiations between the parties and must be custom tailored to fit the project." (Ad–30)

Returning now to relevant portions of the adjudication of Judge Louik dated June 6, 1979, our review of the record supports the correctness of the court's conclusions, as follows:

## "DISCUSSION

"While a great many legal issues have been presented by both parties in this trial, their determination and even their relevance depend upon the resolution of one elementary factual dispute: Did both Bethlehem and Litton intend a legally binding option to arise from the two-page letter of April 25, 1968? All of the authorities both under common

law and the Uniform Commercial Code in Pennsylvania, as well as in other jurisdictions, require that the inquiry into whether a contract exists begins at the ascertainment of the intention of the parties. If the parties intended no binding contract, this Court cannot employ the various rules of interpretation and construction to establish one. It is only after a mutual intent to enter into a legally binding contract is found from the evidence that the Court can proceed to determine the terms of the contract. If no such intent is found, the Court's inquiry must end there.

"The general principles of law appear to be very clear and are undisputed by the parties. That is, if the expressions in the agreement are clear and unambiguous, the Court must determine the intent of the parties solely from a reading of the writing itself. And the obligations of the parties are governed primarily from the writing. If the intent is not clearly expressed or cannot be gained from a reading of the writing itself, then surrounding circumstances may be considered in ascertaining the true intent of the parties. In that situation, subsequent actions of the parties tending to show the construction that they themselves placed upon the writing are important in determining the intention: *Ryan v. [Hudak] Hudack*, 409 Pa. 211, [185 A.2d 570] (1962).

\* \* \* \* \* \*

### "UNIFORM COMMERCIAL CODE

"One of the contentions of Bethlehem is that these agreements come within the Uniform Commercial Code and, therefore, gaps, (if any appear in the documents), may be filled in by the Court. Presented for the Court's consideration are the following Sections of the Uniform Commercial Code:

§ 2–204(3) 'Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.'

§ 2–207(3) 'Conduct by both parties which recognized the existence of a contract is sufficient to establish a con-

tract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.'

§ 2–305(1) 'The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.'

§ 2–305(4) 'Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.'

As indicated, supra, the two letters, PX–4 and PX–1, address the items of greatest concern (in this case with exactly the same express language) that there had to be future agreement. Even if the Uniform Commercial Code is applicable, the Court must first find that there was intent to enter into a contract by the two letters (PX–4 and PX–1). The same criteria has to be used in this regard as is used in determining whether or not there is a contract at common law. Even if the Court had found that there was such an intent, there then arises the matter of ability of the Court to fill in the gaps because, if anything is clear in PX–4 and PX–1, it is that gaps exist which must be filled in.

"If a contract did exist, there are three general areas in which gaps appear which would require the Court's intervention to fill.

"The first term obviously left open was the original escalation index which would be used to calculate the increase in cost per vessel over the time between PX–1 to the date of contract execution.

"The only aspect of this stage of escalation that the documents provided is that an index method of escalation shall be used for this portion of escalation, and that the index shall be mutually agreed upon, as evidenced by the language 'mutually agreed upon index such as ...' Because the parties established the method of arriving at the index as mutual agreement, and because of the complexity of negotiations of escalation clauses in the shipbuilding industry, the Court cannot fill in such a gap in light of Code Section 2–305(4).

* * * * * *

"The second gap relates to 'second stage escalation' which PX–4 and PX–1 establishes as the escalation from the execution of the construction contract to the end of the escalation period:

'... an appropriate contract clause will be included therein providing for quarterly escalation thereafter.'

"An escalation clause is a complex, detailed contractual provision negotiated between parties to provide a means necessary to calculate and pay escalation. It is an equitable concept that escalation clauses must be such as not to give the builder a windfall nor to have the builder suffer losses due to inflation. Because of inflation since the middle 1960's, the escalation clauses became one of the most critical provisions of a ship construction contract. There are many essential elements to be negotiated in an escalation clause, some of which are very critical, such as the indexes to be used, the escalatable amount, the amount escalatable each computation period, the duration of escalation, payment, and the method of computation. These elements can have numerous possible variations resulting from negotiations between the parties. One of the most critical ele-

ments and perhaps the heart of an escalation clause is the amount escalatable each computation period. This is called the 'apportionment' which can have an infinite number of possible variations and will vary from ship to ship depending upon the time of construction, the place of construction, needs and desires of the parties.

* * * * * *

"The third gap which the Court would have to fill if it found a contract otherwise existed, arises from the language indicated that the terms and conditions were to be in accordance with the sample contract and 'any other mutually agreed upon terms and conditions.' In view of the fact that the sample form of contract was for a fixed price contract, there must of necessity be changes required since the writings clearly indicate that the parties contemplated an escalation contract. Such a contract would require additional terms and conditions from those that appear in the sample form.

"In addition, there are numerous other terms which might be expected to be in a ship construction contract of this magnitude. Evidence of this can be found in the contract (DX–12) proposed by the plaintiffs at the September 24, 1973 meeting with defendants. This proposed contract varied substantially from the sample contract in at least twelve separate items (See Finding 28). These altered or added terms strongly suggest that, at least in the mind of Bethlehem, there were many items left out of the sample contract, or left to be negotiated at a later time.

"The breadth of these gaps can only be appreciated in light of the nature of the vessel. According to David Klinges, Bethlehem's Senior Maritime Attorney:

'As you can appreciate this was to be a new departure for maritime transportation for Great Lakes. It contemplated a new revolutionary way of building ships and a new revolutionary way of transporting and discharging—'

The apportionment in quarterly escalation, if nothing else, must be one to be negotiated between the parties. Apportionment does not depend upon the actual use of labor or

material in a particular quarter, but is an item negotiated between the parties depending upon what the parties are aiming at, either for the purpose of securing payments earlier during the construction period or for a later payment, but higher escalation. The extent of the escalation period can also vary, the payment of escalation amounts can vary, and a host of factors can move the parties to a variety of allocation of apportionment. This is also recognized by plaintiff in its Request for Findings, Point 30.59 where they ask the Court to find:

'In the shipbuilding industry, a party entering a contract would, in negotiating an escalation clause, submit to the other party the form of escalation clause desired, and if the owner submitted a proposal that the builder did not like, the builder would make his feelings known to the buyer.' Point 30.59.

"All of the expert testimony indicated that such clauses could not be materialized from the air by the Court. Because of the nature of negotiations in shipbuilding and the extreme complexity of the undertaking, such a clause would require careful negotiations between the parties and would need to be custom tailored to fit the project. There is nothing in the record upon which the Court could extract such a clause.

"Because of the nature of the gaps as has been discussed in this Option, it would appear that only the parties are the exclusive entities capable of filling in the gaps. Because these gaps are so wide, the Court cannot make a new contract for the parties.

\* \* \* \* \* \*

"When we consider all of the above elements and the fact that the parties involved here are two of the largest corporations in this country, and PX–4 is only a two-page letter, the language of Mr. Justice Cohen in the case of *Essner v. Shoemaker*, 393 Pa. 422, [143 A.2d 364 (1958)] is most appropriate:

'It is difficult to believe that the principals, experienced in real estate dealings as they were, would intend to ...

[assent unequivocally] to an oral agreement in a transaction involving more than a quarter of a million dollars, [and] complicated by assignments, mortgages and taxes . . .'

\* \* \* \* \* \*

## "CONCLUSION OF LAW

"1. Bethlehem has not sustained its burden of proof, either in law or in fact, of imposing liability on Litton-Erie, and a finding accordingly will be entered in favor of Litton-Erie on Bethlehem's claim.

"2. Litton-Erie has not sustained its burden of proof imposing liability on Bethlehem in its counterclaim, and a finding accordingly will be entered in favor of Bethlehem on the counterclaim of Litton-Erie."

Adjudication at Ad–12, Ad–25—Ad–26, Ad–29—Ad–33. (References to Record deleted.)

 In summary, we agree with the finding of the lower court that there was no enforceable contract between the parties. It is true, of course, that under the UCC a court may be able to supply missing terms in a contract. Under section 2–204(3) of the UCC, however, a court should only perform this "gap-filling" duty if it determines the parties did in fact intend to make a contract. Here, the lower court found that the absence of the terms necessary to calculate the escalation in price to be allowed for inflation and to apportion that escalation over time pointed not to the mere omission of a few terms in an otherwise complete contract, but instead to the absence of an intent to contract between the parties. A determination as to the intent of parties presents a question of fact that may not be reversed on appeal in the absence of an abuse of discretion. We find no such abuse of discretion here, therefore, we affirm the order of the lower court.

Order affirmed.

HESTER, J., files a dissenting opinion in which ROWLEY and WIEAND, JJ., joined. .

HESTER, Judge, dissenting:

The grossly-oversimplified issue in this matter is "Did the parties intend to make a contract?" Better stated, Did Bethlehem and Litton [1] intend to enter into an option agreement, whereby Bethlehem would have the right to exercise its option to order as many as five one thousand foot self-unloading ore vessels at any time during a five year period? Following a non-jury trial which lasted approximately nine months and which involved in excess of twelve thousand pages of testimony and five hundred exhibits, the Court of Common Pleas of Allegheny County, Senior Judge Maurice Louik specially presiding, held that the parties had not intended a binding, enforceable contract.

For the reasons that follow, I would reverse and remand to the lower court for further proceedings consistent with this Opinion.

On April 25, 1968, the parties executed a ship construction contract, whereby Litton agreed to construct and Bethlehem agreed to purchase a one thousand foot self-unloading ore carrier, commissioned the "Cort" (Hull 101) for approximately 18 million dollars. The construction of the Cort represented Litton's initial endeavor in the ship construction industry, through its newly-developed shipyards on Lake Erie. The Cort was a unique vessel to the ship building industry, since it was larger than any other vessel and since it was designed to include original self-unloading capabilities.

At the execution ceremony on April 25, 1968, as part of the overall transaction, Litton agreed to give Bethlehem a right of first refusal for additional vessels and a short-term option expiring in October, 1968, whereby Bethlehem could elect to purchase up to two additional vessels. None of the aforementioned agreements or options are directly involved in the instant appeal, except as relevant background bear-

---

1. At the outset of trial the parties stipulated that the defendants are to be considered one and the same for this case, and the act of each is deemed to be the act of the other, so that references in this Dissenting Opinion to Litton include Erie Marine and vice versa.

ing upon the intent of and course of dealing between the parties.

As part of this transaction, Litton also delivered to Bethlehem, on April 25, 1968, the following letter:

Bethlehem Steel Corporation
Bethlehem, Pennsylvania
Attn: Ralph K. Smith
Gentlemen:

Reference is made to the ship construction contract signed by our companies this date for the construction by us of a 1,000' self-unloading ore vessel for you. Reference is also made to my letter to you of this date extending to you an option to purchase either one or two additional vessels upon the terms therein set forth.

*We hereby extend to you an offer to enter into an option agreement to have us construct for you from one to five additional vessels* in accordance with "Specifications covering the Construction of a Self-Unloading Bulk Carrier for Bethlehem Steel Corporation" (Number Y 917) dated March 1968, addendum number 1 thereto dated March 28, 1968 and addendum number 2 thereto dated April 17, 1968. *This offer to enter into an option agreement shall be firm and irrevocable until December 31, 1968 at 5:00 p.m. E.S.T.*

The terms of the option agreement are to be as follows:

(a) The specifications for the vessels shall be the specifications referred to above, except for mutually agreeable reduced test schedules of the vessels, if the testing of the vessel to be delivered under the contract executed this date proves successful.

(b) *Bethlehem to have the right at any time within five years after the effective date of the option agreement to order from one to not more than a total of five vessels,* for delivery within 24 months from the date of the order for the first vessel ordered and for delivery within 24 months plus 4 months for each additional vessel ordered within any one calendar year;

provided however no vessel shall be scheduled for delivery between November 31 [sic] and March 31.
(c) The price of the vessels shall be as follows:

| 1st vessel ordered | $22,400,000.00 |
| 2nd " " | $21,400,000.00 |
| 3rd " " | $20,400,000.00 |
| 4th " " | $19,400,000.00 |
| 5th " " | $18,400,000.00 |

(d) The vessel prices are subject to escalation for both labor and material for a base price of $20,400,000.00 for each vessel and based upon Fourth Quarter 1968 mutually agreed upon index such as:

Material—"Material index for Bureau of Ships steel vessel contracts" furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

Labor—"Index of changes in straight-time average hourly earnings for selected shipyards" (June 1962–100) for steel ship construction, furnished to the Naval Ship Systems Command by the Bureau of Labor Statistics of the U.S. Department of Labor.

*At the time of exercise of the option for any vessel,* the escalation shall be computed to the date of contract execution, and an appropriate contract clause will be included therein providing for quarterly escalation thereafter. We will furnish you the labor and material percentages subject to escalation by May 15, 1968.
(e) The terms, contracts and conditions of the ship construction to be in accordance with the attached terms and conditions and any other mutually agreed to terms and conditions and shall contain a clause giving to Bethlehem the right to cancel at any time upon the payment of all of our costs incurred to date of cancellation, including similar vendor and subcontractor cancellation charges, plus 15% of the costs.

Very truly yours,
George K. Geiger

(Emphasis supplied). The specifications referenced in the above-cited letter were previously developed by the parties for the construction of the Cort and were also incorporated into the Cort agreement. Attached to this letter was a *pro forma* Ship Construction Contract, which had been used as the basis of the Cort agreement, with some additions which will be discussed later.

On April 26, 1968, Mr. Robert E. Davis, an attorney for Litton, sent the contractual documents involved in the closing on April 25, 1968, to his contract administrator for safekeeping in the vault file, with a covering memorandum, which described the letter of April 25 as "... a letter extending an offer to enter into an option for five additional vessels."

In the letter of April 25, 1968, Litton committed to provide labor and material percentages subject to escalation by May 15, 1968. By letter of May 8, 1968, Mr. Ellis Gardner, a Senior Vice President of Litton, forwarded the percentages for labor and material as follows:

May 8, 1968

Bethlehem Steel Corporation
Bethlehem, Pennsylvania
Attention: Mr. Ralph K. Smith
Gentlemen:

Reference is made to the letter delivered to you by Mr. George K. Geiger of Erie Marine, Inc. on April 25, 1968, *offering to enter into an agreement giving you the right to purchase five (5) additional one thousand foot ore boats* and providing that we would furnish you the percent of labor and material included in the price, $20,-400,000.00 for each vessel, subject to escalation. These percentages are as follows:

(a) The percent of the escalatable price subject to escalation for material is 64.7%.

(b) The percent of the escalatable price subject to escalation for labor is 28.1%.

Very truly yours,

Ellis B. Gardner
Senior Vice President

(Emphasis supplied). On October 15, 1968, George K. Geiger, President and General Manager of Erie Marine, sent a letter to Bethlehem concerning a projected ship building schedule for Bethlehem's other right of first refusal. This letter stated, *inter alia,* "We note, however, that your five-year option for one to five vessels from the effective date of the above-mentioned contract remains in effect at stated prices plus escalation."

On November 29, 1968, Geiger sent the following letter to Bethlehem:

November 29, 1968

R.K. Smith, Ass't. General
Purchasing Agent
Bethlehem Steel Corporation
Bethlehem, PA 18016

Dear Mr. Smith:

In reply to your verbal request at a meeting held on November 26, 1968, at our facility, *the offer to enter into an option agreement made by Erie Marine, Inc. to Bethlehem Steel Corporation in a letter dated April 25, 1968 was to remain open until the end of calendar year 1968. The agreement would give Bethlehem the right to order from one to five vessels at stated prices, subject to escalation, at any time within five years* for delivery within 24 months of the date of the order for the first vessel ordered, and for delivery in 24 months plus four months for every additional vessel ordered within one calendar year; provided, however, no vessel shall be scheduled for delivery between November 30th and March 31st.

The terms and conditions from the Ship Construction Contract pursuant to this option agreement were to be in accordance with the sample form of contract, plus any additional terms and conditions mutually agreed to at the time of negotiations. *The sample form of contract did not contain a liquidated damages provision, nor did it*

*include any guarantees for defective workmanship or material, speed, dead weight, fuel consumption, etc.* Moreover, the Ship Construction Contract dated April 25, 1968, Article 4(c) granted your company an option within 60 days of receipt of our quarterly projected schedule for a period of five years, to enter into a contract for any vessel shown on subject schedule which you had not previously had an option to contract for. This contract for additional vessels will be based upon price, time of delivery, and other terms and conditions that we can mutually agree upon at the time it is negotiated by both parties.

*Bethlehem's willingness to enter into an option agreement pursuant to our letter dated April 25, 1968,* will not impair or jeopardize any of its rights under the option contained in Article 4(c) of the Ship Construction Contract.

If there is any additional information or answers to any questions that you may require, please call Mr. Clifford Roth, Division Counsel, who will be available at your convenience.

Sincerely yours,

ERIE MARINE, INC.

George K. Geiger

President and General Manager

(Emphasis supplied).

On December 10, 1968, Mr. Clifford Roth, Division Counsel for Litton, and D.H. Klinges, Senior Maritime attorney for Bethlehem, attended a meeting concerning the execution of an option agreement pursuant to the letter of April 25, 1968. That same day, Mr. Klinges sent a letter to Mr. Roth stating, "Further to our meeting this morning I am forwarding to you herewith as promised two copies of the draft option agreement which I trust you will find in order."

On December 13, 1968, Mr. Roth responded to Mr. Klinges by letter stating, "This will acknowledge receipt of your letter of December 10, 1968 with the enclosed draft of the option agreement. I have discussed the agreement with

George Geiger, and we see no objection to concurring in it after it has been executed by Ralph Smith [Bethlehem's Assistant General Purchasing Agent]."

As a result of the exchange of correspondence on December 10 and December 13, 1968, a letter, dated December 31, 1968, addressed to Mr. Geiger, was executed by Ralph K. Smith on behalf of Bethlehem. This letter was also executed by George K. Geiger at the end under a heading "AGREED TO: ERIE MARINE, INC."

Said letter of December 31, 1968, stated in part, "We [Bethlehem] hereby accept your offer of an option to have you construct for us from one to five additional vessels ..." In other material respects, the letter of December 31, 1968, was merely a repetition of the contractual terms stated in the letter of April 25, 1968.

On August 21, 1973, Bethlehem's Vice President of Purchasing, A. Connar, wrote a letter to R.W. Biggs, Vice President and General Manager of Erie Marine, stating as follows:

"We are planning to exercise our options pursuant to the referenced option agreement for additional one thousand foot self-unloading bulk vessels.

Several aspects of the referenced agreement are subject to the mutual agreement of the parties and we request an early meeting with you to resolve these matters. Please let us have your early reply."

In response to the letter of August 21, 1973, Erie Marine sent a letter to Bethlehem dated August 29, 1973, as follows:

BETHLEHEM STEEL CORPORATION
Bethlehem, Pennsylvania 18016
Attn: Mr. A.W. Connar
 Vice President
Gentlemen:

We acknowledge receipt of your letter dated August 21, 1973 in which you indicate that *you are planning to exercise your options pursuant to the option letter*

*agreement between us dated December 31, 1968.* Based on this, we have initiated a full-scale estimate of the current cost to duplicate Hull 101, including start-up costs. This work will not be completed until the end of October. In the meantime, we concur with your suggestion that we meet early to discuss these and other matters for agreement.

Your plan comes as a surprise to us in light of the repeated statements by Bethlehem that you did not expect to exercise any of these options prior to *the expiration of the option period on December 31, 1973.*

Based on these statements, we began—as you know—months ago to phase out the construction mode of our shipyard here at Erie, Pennsylvania to eliminate the work force, and pursue an opportunity to dispose of the facility subject to our remaining obligation to you under Article 17 of the April 25, 1968 ship construction contract [relating to drydocking repair service].

Your current indication that you now plan to exercise options under the December 31, 1968 letter agreement makes it necessary for us to set aside our plans for the disposition of our shipyard here at Erie, and to incur the additional costs to reactivate the facility and bring it back to a level of efficient construction operation. These costs, which are substantial, will be reflected in the prices to be negotiated for the vessels.

Very truly yours,

Ralph W. Biggs, Jr.

Vice President and General Manager

(Emphasis supplied).

On November 16, 1973, Bethlehem sent a letter to Erie Marine stating, "Pursuant to our letter agreement of December 31, 1968, Bethlehem hereby exercises its option to order from you two vessels for delivery of the first vessel within 24 months of this order and for delivery of the second vessel within 24 months plus 4 of this order."

Again on December 26, 1973, Bethlehem sent a letter to Erie Marine stating "Bethlehem hereby exercises its option to order from you a third vessel pursuant to our letter agreement of December 31, 1968, . . ."[2]

The majority is correct in its observation that the findings of fact of a trial court, sitting without a jury, and approved by a court en banc, are the equivalent of a jury verdict. *Brentwater Homes, Inc. v. Weibley,* 471 Pa. 17, 21, 369 A.2d 1172, 1174 (1977); *Hoffman v. Gekoski,* 250 Pa.Super. 49, 52, 378 A.2d 447, 448 (1977). On appeal, we will affirm those findings of fact if they are supported by competent evidence and no abuse of discretion or error of law was committed. *E.I. duPont de Nemours and Company v. Berm Studios, Inc.,* 211 Pa.Super. 352, 354, 236 A.2d 555, 556 (1967). As recently stated by this Court in *First Pennsylvania Banking and Trust Co. v. Liberati,* 282 Pa.Super. 198, 203, 422 A.2d 1074, 1976 (1980):

> "It has been black-letter law in this Commonwealth for sometime that 'the findings of fact by the judge, sitting without a jury, sustained by the court en banc, are given the effect of a jury verdict and if supported by sufficient evidence, will not be disturbed on appeal. *Jenkins Towel Service v. Tidewater Oil Co.,* 422 Pa. 601, 604, 223 A.2d 84 (1966).' *Cohen v. Parker,* 258 Pa.Super. 320, 324, 392 A.2d 814, 816 (1978). See also, *E.I. DuPont de Nemours & Co. v. Berm Studios, Inc.,* 211 Pa.Super. 352, 236 A.2d 555 (1967). Cf. *Stauffer v. Stauffer,* 465 Pa. 558, 351 A.2d 236 (1976); *Charles v. Henry,* 460 Pa. 673, 334 A.2d 289 (1975)."

However,

> "It is equally true that an appellate court is in no way bound by the trial court's conclusions of law based on its finding of fact. *Lawner v. Engelbach,* 433 Pa. 311, 249

---

**2.** The above statement of facts only summarizes the major events relating to this particular transaction between the parties. Other relevant meetings, discussions and correspondence will be referred to later in this Dissenting Opinion, where appropriate.

A.2d 295 (1969); *Peters v. World Mut. Health & Accident Ins. Co.*, 206 Pa.Super. 406, 213 A.2d 116 (1965)."
*Id.*

The threshold issue to be resolved in the instant appeal concerns the contractual intent of the parties. Unlike the majority, which views this issue as a question of fact, I believe the issue of contractual intent is a question of law or ultimate fact.[3] Undeniably, the basic findings of fact of the lower court should not be disturbed if these findings are based upon competent evidence, unless the lower court committed an abuse of discretion or error of law in admitting the evidence from which the findings of fact were derived. However, the contractual intent of the parties as an ultimate fact or conclusion of law is subject to independent appellate scrutiny. Therefore, from the basic findings of fact of the lower court, this Court should draw its own inferences and deductions in determining the ultimate questions of law involved. *In re McKinley's Estate*, 461 Pa. 731, 337 A.2d 851 (1975); *Hankin v. Hankin*, 279 Pa.Super. 179, 420 A.2d 1090 (1980).

My conclusion that the issue of contractual intent in the case at bar is a question of law is buttressed by my observation that no where in the lower court's itemized "findings of fact" can one uncover a provision that "the parties did not intend a contract." Rather, the trial judge inferred that no contract existed from the facts. As such, his inferences, deductions, and conclusions are appropriate subjects for appellate review.

However, even reviewing the issue of contractual intent as a factual finding, I could not join the majority's analysis. As stated above, findings of fact are susceptible to reversal if not supported by competent evidence or if the trial judge abused his discretion. For the following reasons, I believe the lower court misapprehended and, in fact, ignored basic uncontroverted facts, and failed to apply the appropriate statutory law in reaching its conclusion.

**3.** For the distinction between "basic facts" and "ultimate facts", see R. Aldisert, *The Judicial Process*, p. 694 (1976).

There is no question that the instant controversy is governed by Pennsylvania law. However, it is necessary to initially clarify which aspects of Pennsylvania law are controlling. The lower court correctly stated,

"All of the authorities both under common law and the Uniform Commercial Code in Pennsylvania, as well as in other jurisdictions, require that the inquiry into whether a contract exists begins at the ascertainment of the intention of the parties. If the parties intended no binding contract, this Court cannot employ the various rules of interpretation and construction to establish one. It is only after a mutual intent to enter a legally binding contract is found from the evidence that the Court can proceed to determine the terms of the contract."

In arriving at its conclusion that the parties did not intend a legally-binding contract, the lower court stated the general principles of contractual interpretation upon which it relied. Significantly, the lower court did credit authorities recognized under the common law of Pennsylvania, e.g. Williston on Contracts and the RESTATEMENT OF THE LAW CONTRACTS. The lower court also considered the applicability of the Pennsylvania Uniform Commercial Code, Act of April 6, 1953, P.L. 3, *effective July 1, 1954*. Reenacted October 2, 1959, P.L. 1023, effective January 1, 1960. Reenacted and codified, November 1, 1979, P.L. 255, Act No. 86, effective January 1, 1980, 13 Pa.C.S.A. § 1101 et seq.[4] However, the lower court did not specifically hold that the Uniform Commercial Code applied to the instant case.[5] This was error.

Division 2 (SALES) of the Code "... applies to transactions in goods; ..." 13 Pa.C.S.A. § 2102. "Goods" is defined by the Code as "... all things (including specially

---

**4.** Although the events of the instant case occurred prior to the recodification of the Uniform Commercial Code, references to the Uniform Commercial Code in this Opinion will be to 13 Pa.C.S.A.

**5.** The lower court stated, *"Even if the Uniform Commercial Code is applicable,* the Court must first find that there was intent to enter into a contract by the [parties] ..."

manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the prices to be paid, . . ." 13 Pa.C.S.A. § 2105(a). There does not appear to be any dispute between the parties concerning the ability to identify the specially-manufactured ore vessels in question. Litton built the Cort for Bethlehem pursuant to detailed specifications, which were also to be utilized as part of the construction of subsequent ore vessels. Moreover, it is clear that the subject of this contract is "movable at the time of identification". The size of the goods in question is not material as long as they are "movable".[6] It must be concluded, therefore, that the ore vessels in question are "goods", as defined by the Code.

Specifically, the ore vessels in question are "future goods". The Code defines this term, as follows:

"(b) Transferability; 'future' goods.—Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or any interest therein operates as a contract to sell."

13 Pa.C.S.A. § 2105(b).

The Code further defines, "(a) 'Contract', 'agreement', 'sale'.—In this division unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. *'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time."* 13 Pa.C.S.A. § 2106(a). (Emphasis supplied). The applicability of the Code is reinforced by Comment 2 to 13 Pa.C.S.A. § 2105 which states:

6. "Identification" is given a limited function for the purposes of the Code. The concept mainly concerns performance, and the passage of title to goods for purposes of insurability. 13 Pa.C.S.A. § 2501 and Comments 2 and 4 thereto. Since Division 2 of the Code encompasses a contract to sell future goods, it is not necessary for identification to occur at the time of agreement. Identification may occur following the manufacture of goods at the time of delivery, inspection and acceptance. See generally Chapter 25 of the Code, 13 Pa.C.S.A. § 2501 et seq.

"References to the fact that a contract for sale can extend to future or contingent goods and that ownership in common follows the sale of a part interest have been omitted here as obvious without need for expression; hence no inference to negate these principles should be drawn from there omission."

Accordingly, it is clear that the Code applies to the instant case. The issue, as refined by the language of the Code, thus becomes, "Did the parties intend to enter into a contract for sale, whereby Bethlehem would have the right to exercise its option to order specially-manufactured future goods from Litton, resulting in a contract to sell future goods?"

In fact, the instant appeal is governed by the Code even though Litton had no obligation to manufacture the goods until Bethlehem exercised its option. If the parties otherwise intended an agreement to sell future goods, the Code applies even though performance was subject to Bethlehem's exercise of its option, as a condition precedent. *Schmieder v. Standard Oil Company*, 69 Wis.2d 419, 230 N.W.2d 732 (1975).

The Code states:

### Options and cooperation respecting performance [7]

"(a) Specifying particulars of performance—An agreement for sale which is otherwise sufficiently definite (section 2204(c)) to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties. Any such specification must be made in good faith and within limits set by commercial reasonableness." 13 Pa.C.S.A. § 2311(a).

In the instant case, the time of performance, and whether performance would be required at all, was specifically left to Bethlehem as an option. The time within which Bethlehem was required to exercise its option was specified, so there is no issue concerning "commercial reasonableness".

7. See Pa.C.S.A. § 1109, "... section captions are part of this title..."

See *Weilersbacher v. Pittsburgh Brewing Company,* 421 Pa. 118, 218 A.2d 806 (1966).

Therefore, since the Uniform Commercial Code applies to the instant case, the applicability of other general principles of law is limited. The Code states,

> "Unless displaced by particular provisions of the title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause shall supplement its provision."

13 Pa.C.S.A. § 1103. The applicability of the Code to this case is significant beyond the mere question of choice of law. The lower court did not specifically decide whether the Code applies. Rather, the trial court improperly relied upon numerous pre-Code decisions and other authority not involving a contract for the sale of goods.

For instance, the lower court repeatedly cited *Upsal Street Realty Company v. Rubin,* 326 Pa. 327, 192 A. 481 (1937), involving an application for a lease, which along with location, term and rental amount, provided, "Selection of colors will be made after lease is signed". Citing a comment to Section 26 of the RESTATEMENT OF THE LAW OF CONTRACTS, the Court in *Upsal* found that this language was evidence that the parties intended no binding agreement by stating:

> "... if the preliminary agreement is incomplete, it being apparent that the determination of certain details is deferred until the writing is made out; or if an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract."

*Id.,* 326 Pa. at 330, 192 A. at 483. Referring to the above-quoted section of *Upsal,* the lower court reasoned,

> "In light of the formality of the signing of the first fixed price contract for Hull 101 [the Cort], this language dictates that a final writing be signed before the parties

intended to be legally bound.... Another aspect of this language indicates a conclusion that [the letter of April 25, 1968] was merely an expression of preliminary accord."

As will be further discussed infra, the lower court's reliance on *Upsal* is misplaced, since the principles stated therein were specifically displaced by particular provisions of the Code. 13 Pa.C.S.A. § 1103.

Concerning the formation of a contract, the Code provides:

### Formation in General

"(a) General rule—A contract for sale of goods may be made in any manner sufficient to show agreement, *including conduct by both parties which recognizes the existence of such a contract.*

(b) Effect of undetermined time of making agreement—An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(c) Effect of open terms—Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." (emphasis supplied)

13 Pa.C.S.A. § 2204. The Comment to this Section of the Code states:

"Subsection [ (c) ] states the principle as the 'open terms' underlying later sections of this Article. If the parties intend to enter into a binding agreement, this sub-section recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due to the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of 'indefiniteness' are intended to be applied, this Act making provision else-

where for missing terms needed for performance, open price, remedies and the like.

The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions."

From § 2204 of the Code, it is clear that the existence of a contract is initially dependent upon the intent of the parties. If the parties have intended to contractually obligate and benefit each other, their contract is enforceable even if certain terms are left open or are left to be agreed upon in the future. In other words, the Code specifically contemplates that the parties may "agree to agree" with respect to certain terms. The comment to § 2204 acknowledges that, depending upon how many terms are uncertain, an agreement may be defeated due to "indefiniteness" if there is no reasonably certain basis for granting an appropriate remedy. However, the Code specifically provides "gap-filling" so as to avoid defeating a contract which the parties otherwise intended.

Prior to the enactment of the Code in Pennsylvania, a contract would normally not be enforced, due to indefiniteness, if specific terms were missing. See *Potter v. Leitenberger Machine Company*, 166 Pa.Super. 31, 70 A.2d 390 (1950); *Rego v. Decker*, 482 P.2d 834, 838 (Alaska 1950); *Kuss Machine Tool & Die Company v. El-Tronics, Inc.*, 393 Pa. 353, 143 A.2d 38 (1958) (decided under the former Uniforms Sale Act of May 19, 1915, P.L. 453, 69 P.S. § 81, repealed); *Thomas v. St. Joseph's Church*, 343 Pa. 328, 22 A.2d 661 (1941); *Simplex Steel Products Company v. Goleman*, 134 Pa.Super. 305, 4 A.2d 230 (1939); *McNeely v. Bookmyer*, 292 Pa. 12, 140 A. 542 (1928). In *Kuss Machine*, supra, the Court recognized that, under § 9 the former Uniform Sale Act, 69 P.S. § 81 (repealed) "... it could be found that the negotiations between the parties resulted in an express contract, with no price specified; in which case the buyer must pay a reasonable price ..." However, the Court did not expressly decide the issue on

this basis because the Court held that the seller was entitled to a reasonable price for its performance, in any event, on a theory of quasi contract.

A review of Pennsylvania appellate decisions prior to the enactment of the Uniform Commercial Code indicates that the courts were not inclined to fill any gaps. For example, in *McNeely,* supra, the Court held that price was an essential term to a sales contract; if the price were not expressly agreed upon by the parties, no contract existed. See *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 460 (9th Cir.1979).

The intent of the Code, as clearly expressed by 13 Pa.C. S.A. § 2204(c), is to preserve a contract and fill in any gaps, "if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." *Vigano v. Wylain, Inc.,* 633 F.2d 522, 526 (8th Cir. 1980); RESTATEMENT (SECOND) OF CONTRACTS § 33, Comment e (1979). As was stated by Mr. Justice Cardoza in *Heyman Cohen and Sons, Inc. v. M. Lurie Woolen Company, Inc.,* 232 N.Y. 112, 115, 133 N.E. 370, 371 (1920), "Indefiniteness must reach the point where construction becomes futile." See also, *Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp.,* 302 So.2d 404, 409 (Fla., 1974); *Bornstein v. Somerson,* 341 So.2d 1043, 1047 (Fla.App., 1977); *Rego v. Decker,* 482 P.2d 834, 838 (Alaska, 1971); *Stenehjem v. Kyn Jin Cho,* 631 P.2d 482, 485 (Alaska 1981); *Schmieder,* supra; *Steiner v. Mobil Oil Corp.,* 20 Cal.3d 90, 141 Cal.Rptr. 157, 569 P.2d 751, 760–1 (1977).

The lower court correctly recognized that it must first find an intent to enter into a contract by the parties before attempting to complete any terms left open by the parties. However, the lower court incorrectly reasoned that "because these gaps are so wide, the court can not make a new contract for the parties." In effect, the lower court held that, since the parties expressly agreed to agree concerning certain terms, they did not intend to create any enforceable contractual rights or obligations. However, the official

comment to 13 Pa.C.S.A. § 2204 states, "nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement."

Under the Code, parties can expressly agree to be contractually bound, even though certain terms are left open to be negotiated or agreed upon at a future time. It does not matter whether the original agreement is "a preliminary accord", "an agreement to agree", or "an agreement to negotiate". The crucial inquiry is whether the parties intended to enter into an agreement; and, if the parties left certain terms to be negotiated at a future time, then those parties contemplate that those terms will be filled in, on a reasonable basis, through the mutual good-faith negotiations of the parties.[8] *Harvey*, supra, 589 F.2d at 461.

The underlying purposes of the Code are:

"(1) To simplify, clarify and modernize the law governing commercial transactions.

(2) To permit the continued expansion of commercial practices through custom, usage, and agreement of the parties.

(3) To make uniform the law among the various jurisdictions."

13 Pa.C.S.A. § 1102; See *Commonwealth v. National Bank and Trust Co.*, 469 Pa. 188, 194, 364 A.2d 1331, 1335 (1976). The Code also states "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." 13 Pa.C.S.A. § 1203. Therefore, if parties agree tô agree concerning certain open contractual terms, then both parties must attempt to negotiate those terms, on a reasonable basis and in good faith.

As evinced by the letter of April 25 and December 31, 1968, as well as other discussions, negotiations, communications and "course of dealing" between the parties, it is clear that the parties intended to enter into an agreement which

---

**8.** "Good faith" is an essential and prevailing concept of the Code. As defined by the Code, "In the case of a merchant, good faith means honesty in fact and the the observance of reasonable commercial standards of fair dealing in the trade." 13 Pa.C.S.A. § 2103.

would give Bethlehem the right to exercise its option to order as many as five one thousand foot, self-unloading ore vessels from Litton at any time during a five year period.[9] See *Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 305 A.2d 689 (1973).

The letter of April 25, 1968, from Litton to Bethlehem states, *inter alia:*

> "We hereby extend to you an offer to enter into an option agreement to have us construct for you from one to five additional vessels ... this offer to enter into an option agreement shall be firm and irrevocable until December 31, 1968 at 5 p.m. E.S.T."

This correspondence expressly represents itself to be "an offer to enter into an option agreement", which is "firm and irrevocable". See 13 Pa.C.S.A. § 2205.

The letter of December 31, 1968, from Bethlehem to Litton states "We hereby accept your offer of an option to have you construct for us from one to five additional vessels..." Said letter of December 31, 1968, was executed by George K. Geiger on behalf of Litton and Erie under a heading "AGREED TO".[10]

These two letters are "sufficient to show agreement" for the purposes of 13 Pa.C.S.A. § 2204(a). The letter of December 31, 1968, operated as an acceptance of Litton's offer to enter into an option agreement, for the purposes of 13 Pa.C.S.A. § 2206(a).

**9.** 13 Pa.C.S.A. § 1205 states:
> "(a) Definition of course of dealing—a course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.... (c) Effect on agreements—a course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement."

**10.** Since the letter of December 31, 1968, was agreed to by Litton and since the letter of December 31, 1968, did not change any of the material terms set forth in the letter of April 25, 1968, no discussion of 13 Pa.C.S.A. § 2207 (Additional terms in acceptance or confirmation-"The Battle of the Forms") is necessary.

Furthermore, the conduct of the parties manifests that they both recognized the existence of such a contract.

In addition to the letters of April 25 and December 31, 1968, the memorandum of Mr. Davis, an attorney for Litton, of April 26, 1968, described the letter of April 25 as ". . . a letter extending an offer to enter into an option for five additional vessels." On May 8, 1968, Mr. Gardner, of Litton, sent a letter to Bethlehem providing the labor and material percentages, subject to escalation, referring to the letter of April 25, 1968, as, ". . . offering to enter into an agreement giving you the right to purchase five additional one thousand foot ore boats . . . ." On October 15, 1968, Geiger sent a letter to Bethlehem referring to ". . . your five-year option for one to five vessels . . . ." On November 29, 1968, Geiger sent a letter to Bethlehem confirming that the offer to enter into an option agreement ". . . was to remain open until the end of calendar year 1968. The agreement would give Bethlehem the right to order from one to five vessels at stated prices, subject to escalation . . . ." On December 10 and 13, 1968, Mr. Roth and Mr. Klinges met and exchanged letters concerning the drafting of the option agreement (the letter of December 31, 1968).[11]

In determining that the parties had not intended to create a legally-binding option agreement, the lower court heavily relied on ". . . the fact that the parties involved here are two of the largest corporations in this country, and [the letter of April 25, 1968] is only a two-page letter," citing *Essner v. Shoemaker*, 393 Pa. 422, 143 A.2d 364 (1958).

I cannot agree with the majority that this reasoning is supported by the evidence. The letters of April 25 and December 31, 1968, incorporate by reference the detailed

11. The lower court's Finding of Fact Number 14 states:
"14. Between April 25, 1968 and December 31, 1968, there were no discussions, negotiations or agreements between the parties with respect to any of the terms of [the letter of April 25, 1968]." In light of the numerous discussions, conferences and correspondence between the parties during this period, as enumerated above, I am at a loss to understand the basis for this Finding of Fact unless it refers to those terms which the parties agreed would be mutually agreed upon at some future date.

specifications concerning the construction of the self-unloading ore carrier for Bethlehem Steel Corporation, which were used by the parties in connection with the construction of the Cort. These specifications serve the purposes of identifying the specially-manufactured vessels, as contemplated by the parties at the inception of their agreement.

Furthermore, both letters incorporated by reference the *pro forma* Ship Construction Contract which consists of 26 pages and 21 articles and which was also used as the basis of the agreement between the parties for the construction of the Cort. This *pro forma* contract sets forth in detail many contractual terms including specifications, approval and inspection, delivery schedule and manner of delivery, terms of payment, manner of inspection, trial runs, schedule of trial runs, place of delivery and acceptance, allocation of risk of loss, allocation of insurance proceeds, events of default, remedies in the event of default, manner of modification of the agreement, responsibility to defend alleged patent infringements, confidential information, passing of title, schedule of payments, selection of vendors and subcontractors, choice of materials and manufacturers, manner of assignment, governing law, settlement of disputes by arbitration, indemnification against third party personal injury claims, manner of notice, a "no oral modification" clause and an integration or "zipper" clause.

As stated in the letters of April 25 and December 31, 1968, "... the terms and conditions of the ship construction to be in accordance with the attached terms and conditions and any other mutually agreed to terms and conditions..." Thus, the parties specifically agreed that any ship construction contract concerning any vessel ordered by Bethlehem pursuant to its option would be based upon the detailed *pro forma* contract as drafted by Mr. Davis, an attorney for Litton.

This *pro forma* contract was used as the basis of the ship construction contract between the parties dated April 25, 1968, for the construction of the Court, along with the following *additional* terms: a provision for increased ves-

sel capacity through the use of "strapping", an entire Article concerning liquidated damages payable to Bethlehem in the event of unexcusable delays in performance by Litton, a warranty by Litton that the purchase price ". . . is the lowest price offered by the builder for vessels in the quantity and of this design for delivery within the same for a lesser number of months . . .", a section giving Bethlehem an option to purchase additional vessels within 60 days from the receipt of Litton's quarterly ship building schedule "for a period of five years from the effective date of this contract", an entire article relating to a 12-month warranty against any defects in the materials or workmanship of the vessel or any defect in the design by Litton, an article containing guarantees by Litton concerning the capacity of the vessel, the speed capability of the vessel, the unloading system capability of the vessel and the average fuel oil consumption rate of the vessel, as well as liquidated damages provisions concerning the failure of Litton to meet these minimum guarantees, a "Buy American" provision, and a requirement that Litton provide drydocking repair services for the vessel during its life as well as a manner of determining the cost thereof. The agreement of April 25, 1968, concerning the construction of the Cort also contained some minor changes from the *pro forma* contract concerning notice, manner of inspection, and payment schedule. However, most of the provisions of the *pro forma* contract were included in their entirety.

The use of the *pro forma* contract by the parties as the basis of the Ship Construction Contract of April 25, 1968, sharply brings into focus the relevancy of the "course of dealing" between the parties. 13 Pa.C.S.A. § 1205.[12] It is apparent from the documentation of the transaction between the parties which occurred on April 25, 1968, that Litton's offer to Bethlehem to enter into an option agreement was part of this overall transaction, perhaps a contract "sweetener". The course of dealing between the

12. For pre-Code authority recognizing "course of dealing", see *Electric Reduction Company v. Colonial Steel Co.*, 276 Pa. 181, 120 A. 116 (1923).

parties with respect to the construction of the Cort amplifies the intentions of the parties to be legally bound to each other on the basis of the option agreement. Litton obviously desired to enter the shipbuilding industry as evinced by its construction of a ship for Bethlehem. Clearly Litton was hopeful that it would be able to build additional vessels for Bethlehem in the future and granted options to Bethlehem accordingly. As part of the ship construction contract for the Cort, Litton specifically gave Bethlehem a right of first refusal to purchase any of the ships described in its quarterly shipbuilding schedule.

By letter of July 10, 1968, Litton gave notice to Bethlehem of its projected shipbuilding schedule, offered Bethlehem the right of first refusal on projected Hull 102, and submitted to Bethlehem a proposed form of contract which was identical to the *pro forma* contract referenced in the letters of April 25, 1968, and December 31, 1968. The suitability of these basic contractual terms was therefore repeatedly recognized by Litton. The fact that the letters of April 25 and December 31, 1968, specified that the ship construction contract might also contain "any other mutually agreed to terms and conditions..." does not indicate that the parties did not intend to be legally bound *unless* such additional terms were agreed upon. The parties were obviously able to agree to terms concerning the construction of the Cort and consented to similarly negotiate in good faith at some future time regarding any additional terms.[13]

This "course of dealing" between the parties was not considered by the court below. However, Litton itself recognized the relevancy of this course of dealing and the interrelationship between the construction of the Cort and the option agreement. The letter of April 25, 1968, which was drafted by Litton, began as follows:

13. See the second paragraph of Litton's letter of November 29, 1968, to Bethlehem (ante), whereby Litton acknowledged, "The sample form of contract did not contain a liquidated damages provision, nor did it include any guarantees for defective workmanship or material, speed, dead weight, fuel consumption, etc."

"Reference is made to the ship construction contract signed by our companies this date for the construction by us of a one thousand self-unloading ore vessel for you. Reference is also made to my letter to you of this date extending to you an option to purchase either one or two additional vessels upon the terms therein set forth."

Thus did Litton make references to the "course of dealing" between the parties. This evidence cannot be ignored, for under the Code, "course of dealing" is always relevant. Section 2202 of the Code, 13 Pa.C.S.A. 2202 states:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(1) by course of dealing or usage of trade (Section 1205) or by course of performance (Section 2208); and

(2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

Although the letter of December 31, 1968, is obviously not a final expression between the parties of all of the terms which might ultimately become part of a ship construction contract concerning any vessel for which Bethlehem exercised its option to purchase, it is apparent that the letter of December 31, 1968, was intended by the parties to be a final expression of the terms included therein.

As author of the letter of April 25, 1968, Litton was in control of the terms of the offer. Litton also offered and controlled the attached *pro forma* contract. I cannot understand how Litton, as a large corporation, could conceivably have delivered the letter of April 25, 1968, to Bethlehem without intending to be legally bound by the terms stated herein. The letter of April 25, 1968, created a power of acceptance by Bethlehem, which was exercised by the joint-

ly-executed letter of December 31, 1968, was prepared by both the parties and was intended to be a final expression of the terms included therein. "The official commentary to [13 Pa.C.S.A. § 2203] recognizes that the parties may condition their assent on formalities, but must do so expressly. Official commentary to § 203, 1 Uniform Laws Annotated, Uniform Commercial Code 107 (West, 1968)." *Osguthorpe v. Anschutz Land and Livestock Company,* 456 F.2d 996, 1000 (10th Cir., 1972); *Field,* supra 451 Pa. at 418, 305 A.2d at 693; *Goldman v. McShain,* 432 Pa. 61, 247 A.2d 455, 459 (1968); *Melo-Sonics Corp. v. Cropp,* 342 F.2d 856, 859–60 (3rd Cir., 1965). Therefore, the letter of December 31, 1968, "... may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented ... by course of dealing or usage of trade... or by course of performance ..." 13 Pa.C.S.A. § 2202. Under the circumstances of this case, the course of dealing between the parties explains and supplements the letter of December 31, 1968, so as to fortify the conclusion that Litton intended to enter into a legally-binding option agreement with Bethlehem.

The lower court relied, in part, on alleged "contemporaneous oral agreements", in concluding that the parties had not intended an agreement. Since the letter of April 25, 1968, represents itself to be a firm and irrevocable offer to enter into an option agreement and since Bethlehem exercised its power of acceptance by the letter of December 31, 1968, these terms "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement", and any such testimony should have been excluded. The course of dealing between the parties can only be used to "explain or supplement" the letter of December 31, 1968, which became the option agreement between the parties.

The letter of December 31, 1968, may also be "explained or supplemented ... by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." The pro forma contract, which

was authored by Litton and which was incorporated by reference to the letter of December 31, 1968, contained a "zipper" or integration clause which stated, "This Contract embodies the entire understanding between Owner and Builder, all negotiations, discussions and agreements prior hereto between Owner and Builder being merged in this Contract." Obviously, some terms were not included in the letter of December 31, 1968, and the attached *pro forma* contract, since the parties specifically agreed that some open terms would be agreed upon in the future. Therefore, it cannot be said that the letter of December 31, 1968, was intended by the parties "as a complete and exclusive statement of the terms of the agreement." Nevertheless, the letter of December 31, 1981 "... *may not be contradicted ... but may be explained or supplemented ... by evidence of consistent additional terms ...*" [14] (Emphasis supplied).

In addition to the previously mentioned course of dealing between the parties, the following conduct by both parties additionally supports the existence of a contract, for the purposes of 13 Pa.C.S.A. § 2204(a):

1. Mr. Davis of Litton and Mr. Klinges Bethlehem jointly participated in the drafting of the letter of April 25, 1968;

2. Mr. Ellis Gardner, A Senior Vice-President of Litton, provided certain terms for the letter of April 25, 1968, relating to escalation, and he approved and authorized the signing of the letter of April 25, 1968, after it was read to him in its entirety;

3. The aggregate base prices for the five vessels had been previously approved by the President of Litton Industries;

4. In December of 1968, Mr. R.K. Smith of Bethlehem wrote an internal memorandum to Mr. Klinges stating that they should "perform the necessary paper

**14.** See, for example, the Ship Construction Contract for the Cort and the second paragraph of Litton's letter of November 29, 1968.

work in order to take advantage of the option offered in the April 25 letter."

5. In making its internal financial computations of vessel prices for a five year financial plan dated August 18, 1969, Litton referred to the letter of December 31, 1968, as follows:

"A base of $20,400K (Option Agreement with Bethlehem Steel Corp.) was used for boats two on and escalated at 4.53% compounded annually. (Escalation percent was calculated using formula stated in Bethlehem Steel Corp. contract)."

6. In February, 1973, before Bethlehem notified Litton of the exercise of its option, Litton internally listed "Bethlehem Steel Corporation's option to purchase five additional vessels" as one of its "Contractual Obligations."

7. In its internal Financial Forecast of February, 1973, Litton calculated certain escalated contract prices, for the estimated cost of ore vessels and concluded "the contract value, based upon the Bethlehem letter of December, 1968 does not support persuing [sic] this business".

8. On the last page of the same Litton financial forecast of February, 1973, Litton made computations of "ESCALATED PRICES OF ONE THOUSAND ORE CARRIERS COVERED BY THE LITTON/BETHLEHEM OPTION AGREEMENT OF DECEMBER 31, 1968". This study showed the escalated prices for the five boats for 1973 through 1976, based upon the indices set forth in the letters of April 25 and December 31, 1968. The study concluded "(We need faster-moving indices!)"

9. In its financial plan of July, 1973, Litton acknowledged the outstanding option as follows:

"It should be noted that Bethlehem has an option for construction of up to five (5) new vessels. That option will not expire until December 31, 1973. The terms of the

option, if exercised by Bethlehem, would result in substantial losses by Litton."

10. The minutes of the December 7, 1973, Board of Director's meeting of Litton contain the following announcement by Mr. O'Green, the President of Litton:

"Also, Mr. O'Green announced, Bethlehem Steel has exercised an option for construction of two additional ships at the Erie Shipyard. However, he said further negotiations with Bethlehem Steel will take place in order to provide for a price that will assure a profit."

11. In 1970, Mr. Gardner of Litton documented a conversation with U.S. Steel in which he informed U.S. Steel "that Bethlehem Steel had an option for five ore boats and that if they should exercise this option, they would tie up the only available ship manufacturing facility on the Lakes for a period of three or four years."

12. In 1971, Litton attempted to sell its shipyard on the Great Lakes to American Shipbuilding; and, in a draft acquisition agreement, Litton listed its obligations "in and pursuant to that certain agreement between Erie Marine Inc., and Bethlehem Steel Corporation set forth in letters dated April 25, 1968, May 8, 1968, November 29, 1968, and December 31, 1968."

13. In a memorandum dated November 12, 1971, Mr. Gardner stated that one of the reasons for the failure of the deal with the American Shipbuilding was the latter's "refusal to accept the responsibility for building boats for Bethlehem under the option." That same memorandum calculated the "escalated option price for a second [vessel], delivered in 1974 ... would be an estimated $28,840,000.

14. In a letter of March, 1970, from Litton to Bethlehem, Litton stated as follows:

"Bethlehem already has an option agreement covering the next five vessels of the L.S.C. type. We assume that

you continually weigh the escalating cost of exercising these options against the projected going rate, your own fleet cost, the cost and benefits of postponing the decision further, and other investment opportunities in Bethlehem."

15. By letter of April 28, 1970, to Bethlehem, Litton informed Bethlehem of Litton's computed prices as follows: "You may be interested in exploring the possibility of chartering or leasing a second big boat, with an option to buy. To approximate the cost of a big vessel delivered in 1972, I have used the escalation indices and boat prices set forth in the Bethlehem-Litton option agreement of December, 1968: [prices omitted]."

16. At a meeting on September 24, 1973, which had been scheduled by the parties pursuant to their letters of August 21 and 29, 1973, Litton orally submitted to Bethlehem an escalated price for the first option vessel computed by Litton pursuant to the indices specified in the letter of December 31, 1981, at $27,323,777.

Finally, and perhaps most importantly, my review of the record does not indicate a single instance whereby Litton denied Bethlehem's right to exercise its option, nor did Litton ever deny that the letter of December 31, 1968, was intended to be a legally-binding agreement, prior to the expiration of the option period on December 31, 1973. Litton's letter to Bethlehem of August 29, 1973 (ante) is illustrative of this point. In this letter, Litton seemingly repudiated a price term for the vessels based upon the base prices stated in the letters of April 25 and December 31, 1968, plus escalation "based upon ... mutually agreed upon index ...", by interjecting its "substantial" costs to reactivate its construction yards. However, Litton did not deny that Bethlehem had the right to exercise its option. These numerous examples document the "conduct by both parties

which recognizes the existence of such a contract." 13 Pa.C.S.A. § 2204(a). See *Osguthorpe v. Anschutz Land Co.*, 456 F.2d 996, 1000 (10th Cir., 1972).

I also refer to the language of the letters of April 25 and December 31, 1968, which states:

> "*At the time of exercise of the option of any vessel,* the escalation shall be computed to the date of contract execution." [Emphasis supplied].

This quote reinforces the conclusion that the parties intended a legally-binding option agreement with certain terms to be determined "at the time of exercise of the option for any vessel."

Having concluded that the parties intended to make a contract, the next question to be addressed is whether "... there is a reasonably certain basis for giving an appropriate remedy." 13 Pa.C.S.A. § 2204(c).[15]

In addition to the previously-mentioned contractual terms contained in the specifications and *pro forma* contract, the letters of April 25 and December 31, 1968, contain definite terms relating to the period of the option, time of delivery of the vessels, base prices for the vessels, a base index of "Fourth Quarter 1968", "quarterly escalation" of price during construction, specific labor and material percentages (supplied by Litton's letter of May 8, 1968), and a clause providing for Bethlehem's right to cancel subject to liquidated damages.

The terms which were left open by the parties are as follows:

(1) The index by which the material and labor cost escalation would be computed;

(2) "an appropriate contract clause ... providing for quarterly escalation thereafter";

---

**15.** The Official Comment to this Section explains, "The test is not certainty as to what the parties were to do nor as to the exact amount of damages due to the plaintiff."

> (3) "any other mutually agreed to terms and conditions", in addition to the terms and conditions of the *pro forma* ship construction contract.[16]

Concerning "any other mutually agreed to terms and conditions", the word "any" implies that the failure of the parties to agree to any such additional terms would not affect their intention to be legally bound pursuant to the option agreement. Litton repeatedly recognized the suitability of the *pro forma* contract for the construction and purchase of the vessels in question. Not only did Litton author the *pro forma* contract, but it repeatedly submitted the *pro forma* contract to Bethlehem in connection with Bethlehem's various options for the purchase of the vessels. The letters of April 25 and December 31, 1968, reflect that, at the time of exercise of the option for any vessel, the parties would attempt to negotiate in good faith concerning any other mutually agreed to terms.

At the meeting on September 24, 1973, Bethlehem submitted to Litton a proposed contract containing additional terms and conditions which were not included in the pro forma contract. However, many of these proposed additional terms and conditions were previously included by the parties in the ship construction contract relating to the Cort. Therefore, it would appear that Bethlehem did attempt to negotiate in good faith concerning any additional terms and conditions, based upon the course of dealing between the parties relating to the construction of the Cort.

The other open terms directly relate to the ultimate price for the construction of the vessels. The Code specifically addresses this issue as follows:

16. Although the letters of April 25 and December 31, 1968, do contain a specific labor and material index and although Litton subsequently recognized the suitability of the stated index, as well as its ability to compute the escalated costs thereunder, it cannot be said the parties specifically agreed to use the stated index due to the language "mutually agreed upon index such as ...". However, whether Litton negotiated in good faith to agree upon any alternative index relates to the "reasonableness" of the price term, pursuant to 13 Pa.C.S.A. § 2305, as hereinafter discussed.

## "OPEN PRICE TERM

(a) General rule-the parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:

... (2) the price is left to be agreed by the parties and they fail to agree;

... (d) Intent not to be bound without established price. —Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract ...."

13 Pa.C.S.A. § 2305. The parties intended to be bound by the option agreement of December 31, 1968. Therefore, the ultimate price of the vessels was "... left to be agreed by the parties and they fail[ed] to agree". 13 Pa.C.S.A. § 2305(a)(2).[17]

Under the circumstances, the price for the vessels "is a reasonable price at the time for delivery". *Osguthorpe,* supra, 456 F.2d at 1001. However, the parties did specifically agree to stated base prices for the vessels. Therefore, the "reasonableness" of the ultimate price term must be related to the stated base prices, as escalated by a "reasonable" index (using a base of "Fourth Quarter 1968"). See *Bernina Distributors, Inc. v. Bernina Sewing Machines,* 646 F.2d 434, 439 (10th Cir., 1981); *Vigano,* supra, 633 F.2d at 526.

The lower court bifurcated this case and received only evidence relating to the issue of liability. Since the lower court improperly held that the parties had not intended a binding agreement, and since the lower court did not address the various sections of the Code cited herein, this case should be remanded for additional findings of fact, conclusions of law and on the development of an appropriate

**17.** It is untrue that "nothing" was said as to the price. 13 Pa.C.S.A. § 2305(a)(1). See also *Bornstein,* supra, 341 So.2d at 1047; *Blackhawk,* supra, 302 So.2d at 409.

record on matters not already in the record. I would reverse.

ROWLEY and WIEAND, JJ., join in this opinion.